# JANUARY TERM, 1913.*

MANISTEE NAVIGATION CO. *v.* LOUIS SANDS SALT &
LUMBER CO.

1. LOGS AND LOGGING—CONTRACTS—ADVANCES—CONSTRUCTION—
PAYMENT.
Under the terms of a contract to remove sunken logs from a
river and its tributaries, upon terms stated, including an ad-
vance of 50% of the agreed price each month on the basis of
logs raised and skidded during the preceding month; "this
amount to be considered as an advance under this contract,
and not as a payment on any particular lot of logs," plaintiff,
the contractor, was entitled to have advances made treated
as for the contractor's benefit, and such advances applied to
and protected logs secured and skidded, the defendant being
entitled to credit therefor in proportion to the number of
thousand feet in the logs delivered; defendant could not
maintain its claim that the advances should be treated as
payments upon the first and subsequent lots of logs, as deliv-
ered.

2. SAME—CONSTRUCTION OF CONTRACTS.
There was no ground for the contention that the parties had,
by practical construction, interpreted the contract in a dif-
ferent manner, where a payment had been made thereon,
both parties expressly reserving the right to their several in-
terpretations of its provisions without any prejudice, and
leaving the dispute open to future determination.

3. SAME—PARTIES—JOINT CONTRACT.
Where the contract was with several firms or persons, and was
joint in form, but contemplated a delivery to each logowner
of his own logs, as identified by their respective marks, and
where the parties treated the agreement as a several contract,
and each logowner advanced his individual proportion of the
contract price as the timber was scaled, an action was prop-

* Continued from Vol. 173.

erly brought against one defendant for its share of the amount
due and breach of the terms of the contract.

4. SAME.

Plaintiff's first count was in assumpsit, and the second claimed
the right to recover the difference between the amount due
plaintiff under the scale required by contract and the amount
as determined by defendant; the third count being for logs
delivered but not accounted for, and the fourth being as-
sumpsit. The fifth count was for breach of a supplemental
contract between the same parties, providing for a different
method of estimating by scaling lumber actually manufact-
ured by the defendant, who, as plaintiff claimed, employed
wasteful methods of sawing lumber, so that the tally was
less than it should have amounted to if the logs had been
economically sawed. *Held*, that the counts sounded in as-
sumpsit and not in tort, and that there was no misjoinder.

5. SAME—MEASUREMENTS—SCALE.

And, although the parties, by the terms of the agreement, ap-
pointed scalers, whose determination was to be binding, evi-
dence that a different scale than the one designated by the
contract was employed by them, and that the kind of scale
mentioned in the contract, *i. e.*, a fair and equitable scale,
was more liberal to plaintiff than a merchantable scale, which
was the one adopted, raised a question of fact.

6. SAME—EVIDENCE.

Upon a record showing that defendant accounted for all logs
delivered to it by witnesses having first-hand knowledge, and
plaintiff could only produce estimates of doubtful value and
of conjectural character to show the amount of logs claimed
to be unaccounted for, but for one year a satisfactory esti-
mate was made by plaintiff's agents who sorted the timber,
there was testimony to go to the jury as to the amount of
logs during the one year.

7. SAME.

*Held*, also, as to the issues relating to damages for delays and
sinking of logs, and for negligent sawing or wasteful meth-
ods in manufacturing lumber, plaintiff's evidence being con-
jectural and indefinite, defendant's positive and certain, the
court should have instructed a verdict for defendant.

8. SAME—RECOUPMENT—INTERPRETATION OF CONTRACT.

Under a contract requiring plaintiff to make at least one drive
or delivery of all floatable logs each year after 1905, defend-

ant could recoup its damages for failure of plaintiff to make a drive one year.

9. SAME.

Defendant was also entitled to recoup payments advanced for other than sunken or deadhead logs, as specified in the contract; and the determination of the scalers was not conclusive as to the timber which would constitute sunken or deadhead logs.

10. SAME.

Also, the court erred in limiting defendant's right to recoup such damages by the qualification in his charge to the jury that if defendant caused the delay or failure to deliver by neglecting to advance moneys as required by the written agreement, the recoupment should be disallowed, where the evidence failed to sustain the contention that the alleged neglect was due to defendant's fault.

Error to Manistee; Withey, J. Submitted April 2, 1912. (Docket No. 7.) Decided March 20, 1913.

Assumpsit by the Manistee Navigation Company against the Louis Sands Salt & Lumber Company for breach of a contract. Judgment for plaintiff. Defendant brings error. Reversed.

*Glassmire & Ramsdell* (*Frank L. Fowler* and *Watts S. Humphrey,* of counsel), for appellant.

*Thomas Smurthwaite* (*M. E. Neal,* of counsel), for appellee.

BIRD, J. When this case was first argued, the late Justice BLAIR sat throughout the argument and afterward prepared the opinion therein. Since that time a reargument has been had before the full bench. After a consideration of the questions involved, I find myself in accord with his opinion, and I therefore adopt it as containing my views of the case. It follows:

"The plaintiff corporation was organized to improve the navigation of the Manistee river, which contained a great many sawlogs which had accumulated therein dur-

ing the many years said river had been used for running logs. On the 23d of June, 1905, the Navigation Company, as party of the first part, entered into an agreement with the defendant and practically all of the lumbermen operating on Lake Manistee, and A. E. Cartier, containing, among other agreements, the following:

" 'That the said party of the first part, in consideration of the covenants on the part of the parties of the second part hereinafter contained, doth covenant and agree to and with the said second parties that it will raise, bank, drive, sort, and deliver to the respective mills of said second parties situated upon Lake Manistee, in said county and State, all of their deadhead and sunken logs lying and being in the Manistee river and its tributaries, and on or in the bayous, flats, cut offs, and marshes adjacent thereto, and that each year after 1905 said first party will make at least one drive or delivery of all floatable logs to said second parties. And the said parties of the second part, for and in consideration of the aforesaid covenants on the part of the party of the first part, doth covenant and agree to and with said first party to pay it the sum of six dollars ($6) per thousand feet for all their hemlock logs known as deadhead and sunken logs, and the sum of seven dollars and a half ($7.50) per thousand feet for all other logs. Payments to be made as follows: An advance of fifty per cent. (50%) of contract prices to be paid on the 10th day of each month on all logs raised, banked, and skidded during the preceding month. This amount to be considered as an advance under this contract, and not as a payment on any particular lot of logs. On the 10th day of each month, payment to be made for all logs delivered to the respective mills of said parties of the second part during the preceding month, less any amount that may be due said second parties by reason of the advance money above mentioned.'

" It was also agreed that the log owners should furnish their respective stamp and bark marks for the identification of their respective logs, and that the Navigation Company should stamp its own identification mark upon the logs lifted by it. The mark ' Nav' was adopted as such mark. The agreement contained the following clauses as to unidentified logs:

" 'It is further mutually understood and agreed between the parties hereto that all unidentified and unmarked logs raised by said first party shall be stamped with a large ( ) on both ends of logs, and bark-marked with large (—) in middle of logs, and that every thirty days a complete list of the unknown and unidentified logs as above specified shall be rendered to the party of the second

part, and every thirty days the party of the first part shall advertise and sell the same as provided by statute, said second parties paying all costs and charges incident thereto. Said first party is to turn over to a representative hereafter designated by said second parties, the amount or sum received for said logs thus sold, which sum or price shall not be less than the contract price for raising the same, including the costs and charges for selling them. In the event of any of the parties of the second part to this contract purchasing or bidding in the logs advertised and sold as aforesaid, then said first party is to deliver all such logs to the said representative, or at such mill or mills as he shall designate; and said first party shall receive from said second parties the price therefor as heretofore set forth in this contract. It is mutually understood and agreed that said second parties are to hold the party of the first part harmless and to indemnify it fully against all loss and damages of every name and nature for all logs sold by them as aforesaid.'

" There was also a provision that—

" ' All logs scaled under this contract shall be scaled by scalers mutually agreeable to the parties hereto; said scalers to make in all cases a fair and equitable scale, and according to "Doyle's rule," and all logs delivered to said second parties' mills are to be scaled by scalers employed by the Manistee Boom Company; it being understood and agreed that, in the absence of said Boom Company scalers, then the same are to be scaled by scalers mutually agreed upon between the parties hereto, all logs scaled at mills to be done without expense to said first party. The scalers employed to scale the logs when taken out of the waters, flats, or bayous of said stream and its tributaries are to be paid one-half by each of the parties hereto, said first party to board said scalers without cost or charges to said second parties.'

" On August 28, 1905, at a meeting of the parties to the contract, the ' fishhook mark ' was adopted as the mark for the unidentified logs, Mr. J. O. Nessen was chosen as the representative of the log owners in handling the unidentified logs, and Mr. Noud was given ' authority on behalf of the log owners to select scalers as provided in the contract.'

" On the 21st day of September, 1907, a supplemental agreement was made; the principal amendment relating to the method of scaling, as follows:

" ' Of all lumber cut from logs delivered under this contract, board tally shall be kept by some competent tallyman to be mutual-

ly agreed upon, each party here to pay one-half their wages. Said lumber to be sawed so said tally can be kept at the tail of the mill, or the lumber shall be piled separately from lumber sawed from other logs, when said tally shall be made at the time the lumber is shipped, and for each eleven hundred fifty (1,150) feet of hemlock lumber six feet and over in length, graded mill culls and better, sawed as above, said second parties shall pay to said first party six dollars ($6), and for each eleven hundred fifty (1,150) feet of all other kinds of lumber, sawed as above provided, said second party agrees to pay seven dollars and a half ($7.50). It is also understood and agreed that all cedar logs delivered under this contract shall be settled for upon the scale of Boom Company scalers at mill where said cedar logs are delivered at the rate of seven dollars and a half ($7.50) per thousand feet.'

" On December 20, 1909, plaintiff brought this action against defendant alone for breach of contract, classifying the various breaches and damages therefor, as follows:

" ' I. * * * And the said plaintiff delivered to the said defendant, under said contract, a large quantity of sawlogs, to wit, about 7,294,-577 feet of hemlock logs and about 3,156,506 feet of other sawlogs, of which amount there were scaled and reported, as required by said contract, only the amount of 3,294,577 feet of hemlock logs and 1,156,506 feet of other logs, whereupon there became due and owing to the plaintiff by and from the defendant, for said services upon the logs as scaled and reported, the sum of $19,768.06 for hemlock logs and $8,673.80 for other logs, in all the sum of $28,-441.86, less the advances paid as required by said contract upon the logs so delivered, when the same were raised, banked, and skidded, to wit, for hemlock logs $9,884.03, and for other logs $4,336.90, which advances became due to the defendant, upon said logs, when the same were delivered as provided in and by said contract; and the amount due to said plaintiff, after deducting the advances aforesaid, upon each lot of logs as scaled and reported, was and is the sum of $14,220.93 and interest thereon from the time the same, or parts of the same became due, upon each delivery of said logs as delivered, scaled, and reported. Wherefore it became and was the duty of the defendant to pay to the plaintiff, on the 10th day of the month next following each delivery of said logs, the amount due the plaintiff thereon as aforesaid, which duty the said defendant wholly failed and neglected to perform, but claimed, on the contrary, in defiance of and contrary to the terms of said contract, that advances made by it to the plaintiff upon other logs belonging to the defendant, which had been raised, banked, and skidded upon the banks of said river by the plaintiff, were all due

and should be applied in payment of the particular lot or lots of logs so delivered to it by the plaintiff, and wrongfully, and to the great damage and injury of the plaintiff, deducted all of the advances so made by it upon said other logs, then upon said skids, as well as upon the lot or lots of logs so delivered, scaled, and reported, and wholly refused and still refuses to pay the plaintiff the moneys actually due the plaintiff for the logs so delivered, scaled, and reported, whereby the defendant became, was, and is indebted to the plaintiff upon the logs so delivered and actually scaled and reported in the said sum of $14,220.93 and the interest thereon, to the damage of plaintiff of $16,000.'

"II. That the defendant did not make a fair and equitable scale, but an unfair, inequitable, and fraudulent scale, thereby damaging plaintiff to the amount of $2,854.10.

"III. That the defendant used and manufactured large quantities of logs delivered under the contract, without scaling or accounting for the same, to plaintiff's damage $20,000.

"IV. Although the contract provided, '"that said second parties are to receive and manufacture said logs as fast as the same are delivered to them," * * * a large quantity of logs so delivered to it by the plaintiff under said contract were held, kept, and retained in the water by said defendant, and were not manufactured as fast as the same were delivered, and a large quantity of the same logs, to wit, 1,000,000 feet of hemlock logs and 500,000 feet of other logs, became water-soaked and sank to the bottom of said Lake Manistee before the same were scaled or tallied,' to the damage of the plaintiff $10,000.

"V. That the defendant did not manufacture the logs into lumber in accordance with the supplemental agreement, but, 'did cut said logs, or a large portion thereof, into shorter lengths, and manufacture said shorter lengths of logs and lumber into staves, heading, and other products of short lengths, and into wood for use in its manufacture of salt, and for other purposes, and did credit and allow the said plaintiff for only the portion of said logs which it actually did manufacture into lumber,' to the damage of plaintiff $6,500.

"VI. That defendant took and manufactured for its own use large quantities of logs belonging to others of said parties of the second part—

"'And inasmuch as the said plaintiff has performed the services

required of it under said contract, upon the logs so taken, received, and used by the defendant, it was and is entitled to the compensation provided by said contract therefor; and inasmuch as the advances made upon logs so taken by the defendant remain a charge against the plaintiff, and must be paid by it when due, under said contract, the plaintiff is entitled to demand and receive the full contract price therefor.'

"Defendant pleaded the general issue, with notice of set-off and recoupment. At the outset the defendant objected to any evidence being received under the declaration for various reasons specifically set forth. The objections, were, for the most part, overruled, and the case proceeded, resulting in a verdict for the plaintiff of $11,-796.66. The defendant has brought the case to this court for review.

"It was the business of the plaintiff to raise the logs coming under the description of 'deadhead' and 'sunken' from the river, lift them to the bank, and place them on skidways, using for that purpose somewhat expensive steam scows. After these logs were once lifted and banked, they were scaled by scalers, as provided in the contract, for the purpose of ascertaining the amount of the advances. After being allowed to dry out, during the winter and spring, such as were dried sufficiently for the purpose were floated and driven down the river for delivery to the respective mills of the parties of the second part. When the drive reached the mouth of the river, they were driven or gathered in what is called or known as the 'sorting gap.' The logs of the various owners were then separated and placed in pockets ready for delivery to the owner claiming the marks on such logs. This work of sorting and separating was done by the Manistee River Boom Company under a contract with the plaintiff.

"The Manistee River Boom Company is a corporation organized under the laws of this State for the purpose of driving, sorting, and delivering logs, and its operations have been confined to the Manistee river and Manistee Lake. The Manistee River Boom Company sublet its work of sorting and delivering the 'Nav' logs to the Louis Sands Salt & Lumber Company, the defendant, who, as said subcontractor of the Manistee River Boom Company, performed the actual work of sorting and delivering these logs to the mills of the parties of the second part, and it continued to do so from the time the plaintiff commenced the operations under the contract up to the

time of the commencement of this suit, excepting the drive of 1909, which the plaintiff itself sorted at the gap, but which the defendant delivered to the respective mills of the parties of the second part, under a contract directly with the Manistee Navigation Company.

"The river scales apparently show that from 1905 up to and including the season of 1909 plaintiff has lifted, banked, and skidded a total of 22,694,160 feet of logs. Plaintiff gave testimony tending to show that about 17,-000,000 feet were driven to the sorting gap, of which about five per cent. sank. The millowners reported having received 12,471,646 feet, of which amount defendant reported 4,347,354 feet. It was conceded that about one-third of all the logs belonged to defendant. All of the advances provided for in the contract upon the basis of the up-river scales were paid, but no money was actually paid to plaintiff upon its deliveries of logs, except as it was charged upon defendant's books with all prior advances.

" The principal questions in the case concern the proper construction of the contract and the severability of the contract.

" Construction of the Contract.

"The defendant claims that all advances made under the contract are payments upon the first lot of logs delivered, and so on, with the right to deduct all such advances from the contract price of the logs as delivered. The plaintiff claims that the advances apply to and protect all of the logs raised, lifted, and skidded under the contract, and only an amount proportional to the number of thousand feet in the logs actually delivered becomes ' due said second parties by reason of the advance money.'

" It is apparent from the contract that raising, lifting, and skidding the logs would constitute the most difficult and expensive portion of the work, and that the provision relative to advancements was for the benefit of plaintiff in doing that work. The record demonstrates fully that defendant's construction of the contract would nullify the benefit of the advances, and in effect compel plaintiff to carry the advances itself. We think that the plaintiff's construction, adopted by the circuit judge, is in accord with the letter and spirit of the agreement and free from ambiguity.

" Practical Construction.

"Assuming that a contract free from ambiguity is open

to practical construction, we are satisfied that the court properly refused to apply it in this case. The claim rests mainly upon the bookkeeping of the parties and the failure of plaintiff to demand its pay. Whatever effect these matters might have had if continued, such effect was entirely done away with by the act of the parties. The contract runs eight years from September 1, 1905. There was no drive in 1905, a small drive in 1906, and considerable drives in 1907 and 1908; the plaintiff having borrowed $3,000 for the drive of 1907. At a meeting of the parties in the fall of 1908, at which defendant's president was present, representing it and taking part, the plaintiff claimed that the logowners—

" 'Owed us something over $30,000. As a result of that meeting it was finally agreed that they should give us $15,000, that amount to be proportioned amongst the various parties to that contract on the basis that each held logs on the river bank, with the result that the defendant company paid us as their proportion of the $15,-000 something over one-third, something over $5,000. Mr. Filer said: "Now, Mr. Babcock, in accepting this advance, we want it understood that we are not acknowledging that interpretation of the contract, nor admitting your claim to be true," and I said, "Mr. Filer, we will accept the money on the basis that it does not prejudice our claims," and it was so understood that the advance was made on that basis.'

"Mr. Palmer, the plaintiff's secretary, testified:

" 'The meeting was called to order, and Mr. Filer was elected chairman and Mr. J. O. Nessen secretary. The gentlemen asked me to make a statement. They asked me to make my statement in regard to our claim. I told them that there was just one of two things they could do under this contract. They had to either pay us for the amount delivered, or they had to keep their advances in the logs on the bank. The culmination of the whole meeting was that they decided to advance us $15,000 under this contract, and at the close of the meeting Mr. Filer made the statement that this money was given to us, not accepting or rejecting any construction of the contract, but was simply made as an advancement for us to continue business.   *   *   *   As a result of that meeting the logowners agreed to furnish this company $15,000, without prejudice or preference, or any construction of this contract, under the statement of Mr. Filer, as they agreed to. We billed it on the logowners as an advance. This was billed as per resolution of that meeting. This $15,000 that they furnished us was prorated upon the amount of the logs they had on the bank.'

" Defendant's witness Smith testified :

" 'Mr. Palmer took up the question of the contract at that time, and claimed that they owed us the advances on all the logs that were on skids up the river. The logowners objected to that entirely,· but finally agreed that ┊they would advance us $15,000 in order to continue operations. I am not certain, but it seems to me that it was stipulated that this advance should not have any different effect on the contract to any extent. I think Mr. Smith in substance said this, and I think Mr. Filer had something to say in that regard. * * *

" '*Q.* Now at that time this advance of $15,000 was agreed upon ?

" '*A.* Yes.

" '*Q.* Yes; and when that was agreed upon, Mr. Field, it was stated definitely, I think you said, by Mr. Filer and Mr. Smith, that this advance was made without reference to what either party claimed as to the construction of the contract ?

" '*A.* Well, it was understood that this fifteen—

" '*Q.* I am asking you what was said.

" '*A.* Well that was said, that this $15,000 was advanced, but not to have any different interpretation of the contract.

" '*Q.* Was not it stated that neither party waived their claims under the contract ?

" '*A.* Why—

" '*Mr. Navin:* We object to that; he has stated what was said.

" '*The Court:* This is cross-examination.

" '*Q.* Wasn't that stated, Mr. Field ?

" '*A.* I think it was.

" '*Q.* Yes, sir.

" '*The Court:* Do you mean, Mr. Field, that both parties stated that their rights under the contract were not to be prejudiced.

" '*A.* Yes, sir.

" '*The Court:* By the loan ?

" '*A.* Yes; your honor.'

" The arrangement to advance the $15,000, expressly made without prejudice to either party's interpretation of the contract, but leaving the same open for future determination, not only did away with any notion of a practical construction, but also disposed of the question of estoppel raised by defendant.

" Severability of the Contract.

" Although the contract is joint in form between the Navigation Company, of the one part, and the logowners, of the other part, the contract contemplated a delivery to each logowner and millman of his own individual logs,

and, for that purpose, required the furnishing by each, and attachment to the contract, of his individual stamps and marks. From the very beginning down to the commencement of suit, the parties treated the contract and executed it, except as to the unidentified logs, as a separate contract as to each. When the logs were scaled upon the river bank, they were marked with the owner's mark, and each month the scale of his individual logs was served upon him, and upon that scale he made his 50 per cent. advance required by the contract. After the logs were delivered to the owner, they were scaled and sawed into lumber at his mill, and the plaintiff given a report of such scale. Not only does the contract require delivery to be made at the respective mills, but payment is to be made on the 10th of each month ' for all logs delivered to the respective mills of said parties of the second part,' etc., and throughout the owners treated this as an individual and not a joint liability. In fact, from the outset the separate millowners kept separate accounts with the Navigation Company, and when they advanced the $15,000, each paid his pro rata share, based upon their separate interests in the logs then on the banks, as shown by the river bank scale.

" We are therefore of the opinion that the declaration was properly planted upon the agreement as a separate contract with the defendant for the cause of action set forth.

## " The Declaration.

" We do not think there is any force in the objections that there is a misjoinder of causes of action in assumpsit and tort in the same count, or that the assignments of breaches are based upon torts which are not available because of the lack of proper averments of waiving the tort. The sixth assignment of a breach was withdrawn from the consideration of the jury and need not be considered. The first is unquestionably in assumpsit. The second seeks to recover the difference between the amount due plaintiff, upon logs actually delivered to defendant, under the contract scale and under the scale actually used by defendant, and is in assumpsit. The third is for the amount due under the contract upon certain logs belonging to and delivered to defendant, for which it reported no scale and made no account, and is also properly in assumpsit. The fourth is unquestionably in assumpsit. The fifth is that the defendant so wasted the logs in manufacturing

them into lumber as to decrease the amount which plaintiff would have received under the lumber tally if the logs had been fairly and economically sawed, and we think may fairly be treated as in assumpsit. In substance, the assignments objected to are upon the theory that plaintiff performed its part of the contract by recovering and delivering to defendant its sunken and deadhead logs, but that defendant did not perform its part of the contract by paying to plaintiff the compensation for its services to which it was entitled under the contract upon the basis of the number of thousand feet in the defendant's logs which it delivered to the defendant.

"Proof of the Breaches and Damages Thereunder.

"*Second.* The contract required that the scalers should make a 'fair and equitable scale.' There was testimony to the effect that there was a difference between 'a fair and equitable scale' and a 'merchantable scale,' that a 'fair and equitable' scale was much more liberal than a 'merchantable scale,' and that the difference was about 47 per cent. There was also testimony that the logs in question were scaled at defendant's mill by merchantable scale. There was also much testimony to the effect that there was no difference between a 'fair and equitable' scale under Doyle's rule and a 'merchantable' scale under the same rule. Since the contract determined the kind of scale which was to be applied prior to the supplemental agreement, the determination of the scalers appointed by the contract would not be final unless they used the kind of scale designated by the contract. While the testimony as to the amount of the damages on this account is not very satisfactory we cannot say that there was nothing for the jury to pass upon.

"The making of the new agreement as to the mill scale by lumber tally related to the future, and should not be held, as a matter of law, in our opinion, to conclude the rights of the parties under the prior arrangement. It should, however, exclusively govern their rights after it took effect.

"*Third.* It is strenuously insisted that there is no definite evidence whatever on the part of plaintiff to support this breach, and that, on the other hand, the defendant fully accounted, by the positive testimony of witnesses having first-hand knowledge, for every log delivered to it by plaintiff. The plaintiff's case upon this head is necessarily based almost entirely upon estimates, which, for

the years prior to 1909, amount to little more than mere conjecture. The drive of 1909, however, was sorted by the plaintiff, and as to this drive we think the testimony fairly presents a question of fact for the jury as to whether the defendant scaled and accounted for all of the logs delivered to it.

"*Fourth.* There is no testimony in the record of sufficient definiteness to warrant the jury in finding that the plaintiff suffered any damages on account of delay in sawing the logs, and the defendant's testimony is full and positive to the effect that no loss occurred by reason of the sinking of the logs. The case of plaintiff is based upon conjecture, met by definite and positive testimony, and the jury should have been instructed that no damages could be awarded for this alleged breach.

"*Fifth.* Under this head, also, the testimony for plaintiff is too vague, indefinite, and limited to furnish any basis for a definite award of damages. Furthermore, the testimony of the men who actually did the work of manufacturing, and who kept the tally agreed upon in the supplemental agreement, is all to the same effect; that the work was done and the tally kept in the usual way, and as defendant handled its own logs, and in this form of action such tally is conclusive on the plaintiff.

"The Defense of Recoupment.

"It is manifest that the principal object of the lumbermen in entering into the contract was to obtain the delivery of their deadhead and sunken logs at their mills at the earliest practicable moment. To this end the contract required plaintiff, 'each year after 1905,' to 'make at least one drive or delivery of *all floatable logs* to said second parties.' A failure of plaintiff to deliver to defendant in the drive of one year all of its then floatable logs raised and skidded the preceding year would be a breach of the contract, for which it would be liable in damages for any injuries to such floatable logs thereafter, whether from forest fires, floods, the weather, or other causes.

"The contract concerned 'deadhead' and 'sunken' logs only, and plaintiff had no right under the contract to advances upon any other kind of logs. If plaintiff lifted and skidded other kinds of logs belonging to defendant, and caused them to be scaled and reported to defendant as 'deadhead' and 'sunken' logs, and re-

ceived advances because thereof, this constituted a breach of the contract on its part, and entitled defendant to recoup to the extent at least of such advances. The contract does not define the terms 'deadhead' and 'sunken' logs, and there is a conflict of testimony as to what kind of logs constituted such logs, so that it was a question of fact for the jury as to whether the logs in question were 'deadhead' and 'sunken' logs or not. And we are of the opinion that the court erred in instructing the jury that the determination of this question was committed to the scalers by the contract, and that if they acted in good faith their determination was final. Mr. Babcock's instructions to the scalers were 'to scale all logs lifted.'

"We are also of the opinion that the court erred in his instruction relative to certain logs which had been banked and skidded in 1906 or 1907, and which defendant claimed had largely deteriorated in value through not being brought down as required by the contract. After instructing the jury that defendant would be entitled to damages for such depreciation, the court further said:

"'But, gentlemen, that instruction is qualified, and I want you to mark the qualification, because it is somewhat complicated. It is the claim of the plaintiff in this case that it has been hindered in its operations under this contract, because the defendant has not paid it the moneys that it claims to be due from the defendant; and I say to you, if the logs above jam 1 have remained there because of the default of the defendant in not paying what you find to be due plaintiff under the contract, you will not allow the defendant anything at all either for depreciation or loss of logs above jam 1.'

"There is no evidence upon which to base this qualification. Plaintiff made no demand upon defendant for money due it under its construction of the contract, nor intimated to the defendant that it was construing the contract differently from defendant, till late in 1908. On the contrary, Mr. Babcock testified that they refrained from making bills on defendant for moneys due upon delivery of logs:

"'We sent no bill for the balance due, because by sending a bill I believed we would be admitting the correctness of the reports for lumber delivered at the mill of the defendant and the other mills during the existence of this contract. The reports I refer to are the mill tallies of 1906 and 1907, and the lumber tallies for 1906 and

1907, and the lumber tallies for 1908 and 1909, showing the lumber delivered under the contract and logs delivered under the contract.'

"Under such circumstances we think that the qualification should have been omitted.

" We find no error in the rulings of the court rejecting statements of Mr. Cartier as to abandonment of the contract, nor in instructing the jury that there was no evidence in the case of a voluntary abandonment.

" We have only considered such of the 377 assignments of error as we deemed necessary to settle the legal principles upon which a retrial should be had, and which should be sufficient for determining the questions of fact in the case. The record is unduly voluminous, and, for purposes of taxation of costs, will be limited to 500 pages, and the briefs to 200 pages."

The judgment is reversed, and a new trial ordered.

STEERE, C. J., and MOORE, McALVAY, BROOKE, KUHN, STONE, and OSTRANDER, JJ., concurred